# UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DISTRICT

============================== )
                                                    )
IN RE:                                         )
*AQUEOUS FILM-FORMING FOAMS*      )
*PRODUCTS LIABILITY LITIGATION*        )
                                                    )
============================== )
                                                    )
DAVID MARTIN,                           )
                                                    )
              Plaintiff,                        )
                                                    )
                                                    )
              *v.*                                )
                                                    )
                                                    )
3M COMPANY *fka* MINNESOTA       )
MINING & MANUFACTURING CO.;   )
BUCKEYE FIRE EQUIPMENT CO.;    )
CHEMGUARD, INC.; CORTEVA, INC.;  )
DUPONT DE NEMOURS, INC.; DYNAX )
CORPORATION; E.I. DUPONT DE       )
NEMOURS & CO.; KIDDE-FENWALL,  )
INC.; KIDDE FIRE FIGHTING, INC.;    )
KIDDE PLC, INC.; NATIONAL FOAM,  )
INC.; THE CHEMOURS CO.; THE        )
CHEMOURS COMPANY FC, LLC;         )
TYCO FIRE PRODUCTS, LP; UTC        )
FIRE & SECURITY AMERICA'S, INC;    )
and DOES 1 to 100, INCLUSIVE;         )
                                                    )
              Defendants.                    )
_____ )

MDL CASE NO.

## 2:18-mn-2873-RMG

Honorable Richard M. Gergel
U.S. District Court Judge
District Court Judge Presiding

CASE NO.  2:22-cv-03624-RMG

## COMPLAINT FOR DAMAGES AND FOR EQUITABLE RELIEF:

NEGLIGENCE

STRICT LIABILITY

DEFECTIVE DESIGN

FAILURE TO WARN

VIOLATION OF UVTA

FRAUDULENT CONCEALMENT

VIOLATION OF CALIFORNIA UCL

MEDICAL MONITORING TRUST

**DIRECT FILED CASE**

**JURY DEMAND**

///

*COMES NOW* the Plaintiff herein, David Martin, who respectfully alleges as follows:

## PARTIES

### Plaintiff

1.      David Martin ("Plaintiff" or "Martin") is a resident of Vinton, Iowa, and formerly a resident of San Diego County, California.  Martin, at all times relevant hereto, was a member of the U.S. Marine Corps, who during his service was stationed at, *inter alia*, MCB Camp Pendleton, a military installation identified as being contaminated through use of the toxic chemicals which are the subject of this action.  Plaintiff Martin suffers from kidney cancer, inclusive of undergoing surgical intervention (nephrectomy). It was discovered that Martin has elevated levels of the subject chemicals in his system.

### Defendants

2.      Defendant 3M Company *fka* the Minnesota Mining & Manufacturing - Company ("3M") is a Delaware corporation with its principal place of business being located in St. Paul, Minnesota.  3M did and does business nationwide, including within California inclusive with U.S. Military Bases/Posts as to fire-fighting foam products which 3M manufactured, distributed and/or sold, which fire-fighting foams contained toxic chemicals known as, *inter alia*, PFOS, PFOA and/or other PFC's.

3.      Defendant National Foam, Inc. ("National") is a Delaware corporation with its principal place of business being located in Angier, North Carolina.  National  did and does business nationwide, including within California inclusive of with U.S. Military Bases/Posts as to fire-fighting foam products which National manufactured, distributed

and/or sold, which fire-fighting foams contained toxic chemicals known as, *inter alia*, PFOS, PFOA and/or other PFC's.

4.  <u>Defendant Kidde Fire Fighting, Inc</u>. ("Kidde 1") is a North Carolina corporation with its principal place of business being located in Raleigh, North Carolina. Kidde 1 did and does business nationwide, including within California inclusive of with U.S. Military Bases/Posts as to fire-fighting foam products which Kidde 1 manufactured, distributed and/or sold, which fire-fighting foams contained toxic chemicals known as, *inter alia*, PFOS, PFOA and/or other PFC's. Kidde 1 was formerly known as Chubb National Foam, Inc. which was formerly known as National Foam, Inc.

5.  <u>Defendant Kidde PLC, Inc</u>. ("Kidde 2") is a Connecticut corporation with its principal place of business being located in Farmington, Connecticut. Kidde 2 did and does business nationwide, including within California inclusive of with U.S. Military Bases/Posts as to fire-fighting foam products which Kidde 2 manufactured, distributed and/or sold, which fire-fighting foams contained toxic chemicals known as, *inter alia*, PFOS, PFOA and/or other PFC's. Kidde 2 was formerly known as Williams US, Inc. which was formerly known as Williams Holdings, Inc.

6.  <u>Defendant Kidde-Fenwal, Inc</u>. ("Kidde 3") is a Massachusetts corporation with its principal place of business being located in Ashland, Massachusetts. Kidde 3 did and does business nationwide, including within California inclusive of with U.S. Military Bases/Posts as to fire-fighting foam products which Kidde 3 manufactured, distributed and/or sold, which fire-fighting foams contained toxic chemicals known as, *inter alia*, PFOS, PFOA and/or other PFC's. Kidde 3 was formerly known as Fenwal, Inc.

///

7.    <u>Defendant Tyco Fire Products, Inc</u>. ("Tyco") is a Delaware limited partnership with its principal place of business being located in Marinette, Wisconsin. Tyson did and does business nationwide, including within California inclusive of with U.S. Military Bases/Posts as to fire-fighting foam products which Tyco manufactured, distributed and/or sold, which fire-fighting foams contained toxic chemicals known as, *inter alia*, PFOS, PFOA and/or other PFC's.  Tyco acquired the Ansul Company, a well known fire suppression company, in 1990, whose products Tyco, as successor in interest, continues to use in the Tyco line of products.

8.    <u>Defendant Buckeye Fire Equipment Company</u>. ("Buckeye") is an Ohio corporation with its principal place of business being located in Kings Mountain, North Carolina.  Buckeye did and does business nationwide, including within California inclusive of with U.S. Military Bases/Posts as to fire-fighting foam products which Buckeye manufactured, distributed and/or sold, which fire-fighting foams contained toxic chemicals known as, *inter alia*, PFOS, PFOA and/or other PFC's.

9.    <u>Defendant Chemguard, Inc</u>. ("Chemguard") is a Texas corporation with its principal place of business being located in Marinette, Wisconsin.  Chemguard did and does business nationwide, including within California inclusive of with U.S. Military Bases/Posts as to fire-fighting foam products which Chemguard manufactured, distributed and/or sold, which fire-fighting foams contained toxic chemicals known as, *inter alia*, PFOS, PFOA and/or other PFC's. Chemguard was acquired by Tyco International Ltd, a Republic of Ireland Corporation in 2011, which was acquired in 2016 by Johnson Controls International, PLC a multi-national conglomerate located in Cork, Ireland.

10.   Defendant Dynax Corporation ("Dynax") is a Delaware corporation with its principal place of business being located in Elmsford, New York. Dynax did and does business nationwide, including within California inclusive of with U.S. Military Bases/Posts as to fire-fighting foam products which Dynax manufactured (inclusive of feed stock/formularies), distributed and/or sold, which fire-fighting foams contained toxic chemicals known as, *inter alia*, PFOS, PFOA and/or other PFC's.

11    Defendant UTC Fire & Security Americas, Inc. ("UTC") is a North Carolina corporation with its principal place of business being located in Lincolnton, North Carolina (albeit it appears that location was closed, or is process of closing as of 2019 and transferring to a new location, believed to be Minnesota or Florida).   UTC was formerly known as GE Interlogix, Inc. UTC did and does business nationwide, including within California inclusive of with U.S. Military Bases/Posts as to fire-fighting foam products which UTC manufactured, distributed and/or sold, which fire-fighting foams contained toxic chemicals known as, *inter alia*, PFOS, PFOA and/or other PFC's.

12.   Defendant E.I. Dupont De Nemours & Company ("Dupont 1") is a Delaware corporation with its principal place of business being located in Wilmington, Delaware. Dupont 1 did and does business nationwide, including within California inclusive of with U.S. Military Bases/Posts as to fire-fighting foam products which Dupont 1 manufactured, distributed and/or sold, which fire-fighting foams contained toxic chemicals known as, *inter alia*, PFOS, PFOA and/or other PFC's.  On information and belief, in 2017, Dupont 1 merged with Dow Chemical to create DowDuPont, which later spun several divisions and uses the name DuPont.

///

13.    <u>Defendant Dupont De Nemours, Inc</u>. ("Dupont 2") is a Delaware corporation with its principal place of business being located in Wilmington, Delaware. Dupont 2 did and does business nationwide, including within California inclusive of with U.S. Military Bases/Posts as to fire-fighting foam products which Dupont 2 manufactured, distributed and/or sold, which fire-fighting foams contained toxic chemicals known as, *inter alia*, PFOS, PFOA and/or other PFC's. Dupont 2 was formerly known as DowDuPont.

14.    <u>Defendant Corteva, Inc</u>.  ("Corteva") is a Delaware corporation with its principal place of business in Delaware.  Corteva conducts business throughout the United States, including in California, inclusive of a large office/agriculture laboratory complex in Northern California. Corteva was initially formed in February 2018.  From February 2018 until June 1, 2019, Corteva was a wholly owned subsidiary of DowDuPont. On June 1, 2019, DowDuPont separated its agriculture business by spinning it off into Corteva. Corteva assumed assets and liabilities of DuPont and Dow (inclusive of spin offs/merger entities).

15.    The true names and capacities of the Defendants named herein as Does 1 to 100, inclusive, whether individual, corporate, associate or otherwise are not sufficiently known to Martin at this time and are sued by fictitious names. Martin will seek leave of this Honorable Court to amend to show the true names and capacities of Does 1 to 100, inclusive, when they have been ascertained with requisite certainty, inclusive of through discovery.

16.    Martin is informed and believes and based thereon alleges that each named and unnamed Defendant, at all times relevant hereto, was the agent, representative, employee, partner, associate and/or joint venturer of one or more of the remaining

6

Defendants, acting within the course and scope of such relationship. Martin is further informed and believes, and further alleges that each of the Defendants herein, named or unnamed, knowledgeably consented to, ratified and/or otherwise authorized the acts and/or omissions complained of hereinbelow.

## JURISDICTION and VENUE

17.    This action invokes the subject matter and personal jurisdiction of the Court and seeks in excess of $ 75,000.00 not including fees or interest. Defendants, and each of them, are entities with a long history of purposefully availing themselves of, doing business in, and/or maintaining regular and systematic contacts with the State of California, inclusive of stream of commerce. Said Defendants purposefully directed their activities to California by selling a product that was known by Defendants to be toxic which would cause injury and harm in California, to people and the environment. The injuries and damages herein pled arise directly from the sales of the known toxic product in California. Moreover, the injuries and damages herein pled arise from tortious acts committed and harm occurring in California and in San Diego County within the meanings of *Cal.C.Civ.P.*, §§ 395[a] and/or 395.5, and § 410.10, *Cal.Con*. Art. VI[10], by Defendants, and each of them, jointly or severally, and/or in acting in concert with each other. This matter is direct filed in the MDL captioned *In Re: Aqueous Film-Forming Foam Products Liability Litigation*, MDL Case No. 2:18-mn-2873 RMG in accord with 28 USC §1407, *et seq*, as well as CMO 1, *et seq*., as issued by the Honorable Court. Plaintiff's home district is the United States District Court, for the Southern District of California, San Diego Division. Plaintiff reserves the right to seek proceedings under, *inter alia*, FED.R.CIV.P., Rule 20 with other similarly situated plaintiffs.

7

## FACTS and SCIENCE APPLICABLE

18.    This action involves highly toxic chemicals which have earned the designation "the forever chemicals" because they do not breakdown and their insidious nature allows them to travel through soil and into groundwater while maintaining their deadly nature for decades.

19.    This action deals with Aqueous Film Forming Foams ("AFFF") that were designed, manufactured and sold as firefighting compounds.    AFFF compounding includes *Perfluoro octane Sulfonate* (commonly known as "PFOS"), *Perfluorooctanoic Acid* (commonly known as "PFOA"), and/or other *Per*-and *Polyfluoroalkyl* substances (together, with PFOS and PFOA, commonly known as "PFAS") which are manmade organofluorine compounds (in this case commonly referred to as fluorinated surfactants/fluorocarbon surfactants). The compounds are designed to lower the surface tension of water so as to create a firefighting foam to quell/smother (cutting off oxygen), for example, jet fuel fires.

20.    AFFF is created by mixing fluorine-free hydrocarbon foaming substances (chemical agents designed for a particular purpose) with fluorinated surfactants and mixing that with water which creates an aqueous film, i.e.: Aqueous Film Forming Foams ("AFFF").  The manufacturing processes involved in this action are asserted to have used flourocarbon surfactants which are believed to include PFOS and PFOA (and/or other per fluorinated compounds known as "PFC"' are also believed to be in the mix.  PFC's are posited to break down in PFOS and PFOA).

21.    Plaintiff joined the USMC and was subsequently assigned to MCB Camp Pendleton, CA (1989-1990).   At all times relevant, Plaintiff lived/worked on Base at Camp

Pendleton using and drinking the water.  On information and belief, Camp Pendleton has a PFAS environmental contamination level of 820.8ppt (EPA max of 70ppt | California. Response max 10-40ppt).

22.     In or about 2017, Martin was diagnosed with kidney cancer and commenced on-going medical treatment inclusive of surgical intervention *via* a right nephrectomy.  As known by Defendants, kidney cancer is a disease linked to PFAS contamination.  *See*, for example, *C8 Science Panel Report*.

23.     Martin did not discover that PFAS was a cause of the harm until approximately mid-Fall 2020, when he saw internet information.

### SUMMARY OF RELIEF SOUGHT

24.     Granting an award to Plaintiff of prejudgment interest, costs and attorneys' fees.

25.     Granting multiple damages and attorney's fees under those Counts and/or factual allegations where applicable statute, case law, or fundamental justice permit or require same.

26.     Granting punitive damages and attorneys' fees under those Counts and/or factual allegations where applicable statute, case law, or fundamental justice permit or require same.

27.     Equitable relief, as well as disgorgement of all proceeds flowing from Defendants' unjust and unlawful fraudulent pattern and practice of misrepresenting, concealing, and omitting necessary information from Plaintiff and similarly situated Californians.

///

## FIRST CAUSE OF ACTION

[*Negligence/Gross Negligence*]

28.    Plaintiff respectfully realleges and incorporates ¶¶ 1 to 27, inclusive as though set forth fully (including any exhibits) herein.  Each cause of action is pled in the alternative.

29.    Defendants, and each of them, were engaged in the design, manufacture, and sale of firefighting foams ("AFFF") which contained chemicals known as PFC's (per fluorinated compounds), including PFOS and PFOA from the 1960's forward. Prime markets for AFFF included airports and fire departments, specifically including those operated by the U.S. Navy, the U.S. Air Force, the U.S. Army, and the U.S. Marine Corps, inclusive of such installations in California.

30.    In or about the late 1960's, testing by Defendants and some of them, (specifically including 3M and Dupont) began to reveal that PFC compounds (initially regarding PFOA), did not breakdown or degrade after their intended use but instead would remain in the environment, inclusive of eventually reaching water supplies. Moreover, the compounds were found to not only be toxic, but would accumulate in humans.  Additional testing revealed to Defendants, specifically including 3M and Dupont, that the compounds had higher toxicity than understood from the original testing.  By not later than that time, 3M and at least Dupont, had actual knowledge of defective design in the chemical compounding of its AFFF products, which gave rise both to a duty to adequately warn those who could be affected and to reformulate.  Neither 3M nor Dupont did so, but instead permitted the toxic AFFF to continue to be manufactured, sold and/or distributed in its toxic condition knowing its potential harms.

31.    Further testing by 3M and Dupont, during the 1970's, provided the information that PFOA and PFOS had in fact been found to have accumulated in the blood of humans, specifically their employees. During that time, Defendants National Foam and Tyco entered the AFFF market. These Defendants also learned that the toxic compounds affected a wide portion of the population in general (who had been exposed via use and/or soil or water contamination), including the fact that each exposure accumulated in the human body.  Defendants failed to disclose this knowledge and did not notify or warn their clients, the public at large nor even the appropriate government agencies, but instead continued sales to unsuspecting users.

32.    Research by Defendants continued (including 3M and Dupont) and by the 1980's provided data that exposure to the subject matter toxic chemicals, specifically PFOA, resulted in increased incidence of substantial risk of birth defects, cancers, and adverse liver enzyme impact in humans.  Defendants continued in their failure and/or refusal to disclose such findings/indicia.  Defendants did not report their findings to any public agency, did not publish any relevant data, and did not notify or warn any clients or the public.

33.    By the latter 1990's, Defendants, and each of them, knew that PFC's (PFOA and PFOS) were an extreme biohazard, specifically including their inability to break/degrade in soil or water which permitted the chemicals to remain for years, if not decades, their abilities to travel through air, water and soil once introduced into the environment, their ability to be absorbed into the human body in multiple manners (consumption, inhalation, dermal), and their ability to build up in the human body with each exposure.

11

34.    During that time period Defendants Chemguard and Dynax entered the AFFF market (manufacture and sell).  Dynax manufactured and sold the fluorosurfactants and fluorochemicals for the foam agents. Defendant Buckeye entered the AFFF market in the early 2000's.

35.    Defendants also learned that the toxicity of the chemicals was extreme/ultra-hazardous even when used for their intended purposes (including fire-fighting) and that the chemicals were found to be accumulating in the bloodstream, liver and kidneys of humans and animals in the human food chain.  Further, that the chemicals were being associated with numerous diseases such as cancer (testicular, pancreatic and liver), high cholesterol levels, thyroid changes, autoimmune issues, and pre-eclampsia.

36.    It was understood by Defendants that the manifestations of disease could occur many years after original exposure to the chemicals.  Moreover, Defendants knew that the chemicals design permitted their toxicity to remain a bioaccumulation threat with severe physical adverse effects as above for years, if not decades, in each place where the chemicals were used as intended, *i.e.*: a known significant potential latency period.

37.    For example, California has numerous military installations, of which some 29 have been identified with PFC (PFAS and/or PFOS) contamination (soil/water), many of which installations were active during at least the 1960's forward.  Thousands, if not tens of thousands, of military and civilian personnel were stationed at those posts/bases during that time period with risk of exposure to those ultra-hazardous chemicals.  Here, Martin was stationed at Camp Pendleton, a known contaminated installation.

38.    Defendants continued to manufacture, sell, and distribute AFFF containing PFC/PFAS and/or PFOS.  Defendants not only concealed the true ultra-hazardous nature

of the chemicals and the severe adverse health consequences from exposure; Defendants fraudulently maintained that there were no hazards with products.

39.    In or about 2000, 3M exited from the AFFF market by phasing out its production of the PFC/PFAS and PFOS agents/products.  In doing so, 3M still maintained that those products were safe.

40.    Concurrently, the EPA issued a statement that, based on then known data, which found that the chemicals were "very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term".

41.    In or about 2001, led by Dupont, the remaining Defendants (excluding 3M and including National Foam, Kidde 1, Kidde 2, Fenwall, Tyco, Buckeye, Chemguard, Dynax, Chemours 1, Chemours 2) formed the Fire Fighting Foam Coalition ("FFFC") whose purpose was to continue the manufacture, sale and distribution of AFFF containing fluorosurfactants, as primarily manufactured by Dupont (who essentially took over from 3M).

42.    FFFC was an information and business enterprise dedicated to the continuation of the use of AFFF and to the on-going protection of its members against any problems/liabilities which would occur in the event their clients, the government and the general population learned the truth about fluorosurfactants such as PFAS and/or PFOS as used in Defendants' AFFF.

43.    Members of FFFC also shared (amongst themselves) data and information regarding the toxicity of the compounds.  Accordingly, FFFC was also dedicated keeping all of the facts secret, parrying any inquiries, to allay any apprehensions as to

environmental and/or human impacts. FFFC was designed and managed so as to actively conceal the facts from regulators and the public.

44.    In or about 2012, an epidemiological study was conducted, which found a probable link between PFOA and several diseases (basically the same as found by 3M and Dupont earlier, but which had been concealed).

45.    In 2016, the EPA issued a formal Health Advisory finding that PFAs and PFOS constituted a health hazard if found in drinking water in levels in excess of 70 parts per trillion ("ppt").

46.    In 2017, Congress appropriated approximately $ 50,000,000 to address PFC (PFAS/PFOS) contamination at military installations, inclusive of bringing in the CDC to perform studies as to the effects of the toxic compounds on human health.

47.    In 2018, the EPA issued a report, which included the recommendation that contamination levels be lowered from 70ppt to 11ppt (PFOA) and 7ppt (PFOS).

48.    As of 2019, California is in the process of having contamination levels lowered to 5.1ppt (PFOA) and 6.5ppt (PFOS).

49.    Due to the years of concealment and disinformation by the Defendants, parties injured by AFFF and its toxic compounds would not have discovered facts sufficient to put them on notice of the actual grounds for their injuries nor the parties responsible for those injuries until recently, specifically including those members of the armed services.

50.    Defendants, and each of them, owed a duty of care to Plaintiff, as a user of AFFF and/or as a person reasonably foreseeable by Defendants to be subject to exposure.

51.    Defendants, and each of them, owed a duty of care to Plaintiff to act reasonably with respect to AFFF products and to not place ultra-hazardous/inherently dangerous toxic chemicals into the steam of commerce where significant harm could be caused to Plaintiff (directly or through environmental contaminations) when the products were used as intended.

52.    Defendants, and each of them, owed a duty of care to Plaintiff to truthfully inform Plaintiff (directly and/or through truthful reporting to government agencies) of any acquired knowledge of dangerous/toxic propensities of the products which posed significant risk of harm to the Plaintiff, inclusive of through environmental contamination, *inter alia*, water contamination.

53.    Defendants, and each of them, owed a duty of care to Plaintiff to act to ameliorate the harm done to the environment/water supplies which were contaminated and were subject to contamination, thereby seeking to mitigate and remedy the long term dangers of their AFFF.

54.    Defendants, and each of them, breached their duties owed to Plaintiff by introducing ultra-hazardous/inherently dangerous chemical compounds into the stream of commerce via a purported "safety product" (AFFF).

55.    Defendants, and each of them, knew or should have known of the insidious toxic nature of the chemical compounds used in AFFF, including, but not limited to its "forever nature" in that they did not break down/degrade and persisted for years, that due to their chemical attributes was highly mobile when deposited into the environment, that such mobility permitted the toxic chemicals to reach and contaminate wells and ground

water, inevitably causing human exposure which would result in foreseeable adverse health impacts, including, but not limited to cancer and other diseases.

56.    The fact that Plaintiff suffered the injuries herein complained of was foreseeable to Defendants, and each of them.  Defendants knew that AFFF contained toxic chemical agents, including, but not limited to PFC's/PFAS and/or PFOS.

57.    Defendants knew that those chemical agents would enter and persist in the environment when used as intended.

58.    Defendants knew that those chemical agents did not degrade and would contaminate the environment for years and decades.

59.    Defendants knew that human exposure to the toxic chemicals (by use, by dermal contact, by soil contamination and/or by water contamination) posed a severe risk of harm to humans so exposed.  Defendants knew that exposure to the toxic chemicals posed a significant risk to humans for such diseases as cancer, birth defects, and autoimmune disease.

60.    Defendants knew there was a direct causal connection from exposure to the toxic chemicals and impairment of human health.  Accordingly, the complained of damages as sustained by Plaintiff were wholly foreseeable to Defendants.

61.    As a direct and proximate cause of exposure to the Defendants' toxic chemicals, Plaintiff sustained injuries.  Plaintiff's injuries are of the type known by Defendants to be caused by exposure, *i.e.*: here, kidney cancer.  Defendants further knew that the latency period between exposure and manifestation of disease that could be many years.

///

62.    Defendants knew that their actions and statements over many years concerning the viability and safety of the products would prevent the Plaintiff from understanding the true cause of his disease and determining who was liable for his injuries - all in an effort by Defendants to avoid the liability and consequences for their acts and omissions.  It has only been recently, late 2019 and into 2020, that the facts have become somewhat known to the public who had some reason to inquire and who diligently searched such knowledge. Here, Plaintiff Martin did not become aware of facts until mid-Fall 2020.

63.    Defendants acts and omissions, specifically including the years of active concealment of the facts, as well as the failures/refusals to ameliorate the toxic contamination of Defendants' "forever chemicals" in the environment, goes beyond mere carelessness or failure to act.  Defendants acts and omissions (inclusive of the years' long campaign to conceal the truth) was conduct engaged in with an extreme disregard for the health and safety of others, knowing that such disregard was substantially likely to cause foreseeable harm, such to constitute gross negligence.

64.    As a direct and proximate cause of the negligence/gross negligence of Defendants, and each of them, Plaintiff sustained injury and is entitled to compensation for all damages for injuries to persons, *i.e.*: under *Cal.Civ.C.*, § 3333 (*inter alia*, actual/special damages, consequential damages, future medical care) and pre-judgment interest on economic damages under *Cal.Civ.C.*, § 3288.  All such damages shall be proven at the time of trial.

65.    Defendants, and each of them, manufactured, sold and/or distributed the AFFF product to military installations in California over the course of years.  It is not

presently possible to determine the specific manufacturer in each instance of contamination since the contamination reaches the ground water supply. Accordingly, Plaintiff must, and hereby does, seek recovery from all Defendants, jointly and severally as each made substantial contribution to the harm.

66.     In this instance as Defendants, over the course of many years, conspired to conceal the true inherent dangers of the products, the ultra-hazardous nature of the toxic chemicals, and to seek to avoid liability for the consequences of their defective product - all for Defendants to continue to gain unjust enrichment from the manufacture, sale and distribution of those toxic chemicals.

67.     Defendants, and each of them, acted in concert by participating in a common plan to engage in the negligent/grossly negligent conduct, inclusive of the acts of concealment so as to continue to sell and profit from the inherently dangerous AFFF products containing the toxic chemical agents/surfactants. Concert of action liability attaches, as does Enterprise Liability, as Defendants, and each of them were involved in a shared enterprise. Accordingly, Defendants, and each of them, are jointly and severally liable to Plaintiff.

68.     Defendants, and each of their acts and omissions were undertaken with a conscious and deliberate disregard for the health and safety of others arising from the inevitable risks of harm from their AFFF products and components/formularies containing the toxic surfactants (PFC's/PFAS and/or PFOS) such as to be willful or wanton, thereby warranting, in addition to any other award, punitive and exemplary damages in an amount to be proved at time of trial.

///

## SECOND CAUSE OF ACTION

(*Strict Liability*)

69.    Plaintiff respectfully realleges and incorporates ¶¶ 1 to 68, inclusive as though set forth at length herein.  Each cause of action is pled in the alternative.

70.    As set forth, *inter alia*, in ¶¶ 28 through 49, above, PFC's specifically including, PFAS and PFOS, are manmade chemicals not found in nature.  Research and studies have established that such chemicals (surfactants) were a main component of AFFF, a fire-fighting foam used all over the country, inclusive of military installations in California.  Research and studies, inclusive of those by the US government have further established that such chemicals are toxic, ultra-hazardous, and inherently dangerous even when used as intended.

71.    Defendants, and each of them knew or should have reasonably known that release of the toxic chemicals (including PFAS and PFOS) would be extremely hazardous to the environment, which in turn would pose significant risks of harm to humans, and which, in fact, caused harm to humans.

72.    Defendants, and each of them, despite such knowledge, designed, manufactured, marketed, sold, supplied and/or distributed products containing the toxic chemicals and/or sold components containing the toxic chemicals doing so as a manufacturer, retailer, supplier, distributor, wholesaler and/or assembler of the AFFF fire-fighting foam containing the toxic and inherently dangerous chemical components.

73.    Defendants, and each of them, knew they could have created an alternative design for the AFFF product that did not use the formulary which produced the toxic and inherently dangerous chemicals, specifically including PFAS, PFOS and/or PFOA.  That

alternative formulations were already available, met practicality and similarity of cost, and were feasible for the technological purposes. That is underscored by the fact that Defendants have belatedly phased over to such technologies/formulations in order to seek to avoid any further liability.

74.     In aggravation, despite Defendants, and each of their knowledge of the toxic, ultra-hazardous and inherently dangerous chemical agents ("the forever chemicals") of AFFF, and of the foreseeable unreasonable danger posed thereby to humans for exposure to cancer and other potential life threatening diseases, Defendants did not provide any warnings or instructions to the users of AFFF nor to the public, specifically including military personnel regarding use/handling/storage of AFFF, soil contamination and water contamination. *Contra*, Defendants sought to conceal the unreasonably/inherently dangerous nature of their defectively designed AFFF.

75.     In aggravation, despite Defendants, and each of their knowledge of the defective design of AFFF containing the toxic, ultra-hazardous and inherently dangerous chemical agents ("the forever chemicals") of AFFF, and of the foreseeable unreasonable danger posed thereby to humans for exposure to cancer and other potential life threatening diseases, Defendants did not use an alternative design that was not ultra-hazardous and inherently dangerous to the environment and humans even when used as intended, which alternative was available when and after it became feasible to design, manufacture, market and/or distribute product not containing PFC's (including PFAS and PFOS). To the contrary, Defendants sought to conceal the unreasonably/inherently dangerous nature of their defectively designed AFFF so as to continue to profit by such defective design, manufacture, marketing, sale and/or distribution.

76.     The users of the defective AFFF and the public, specifically including members of the military and their families in California, were not aware of the defective and inherently/unreasonably dangerous nature and consequences of using the defective AFFF product as intended nor of the risks of severe health hazards caused from the contamination of the environment (soil and water).  To the contrary, Defendants, for years, attempted to actively conceal such material information from the public.

77.     Defendants, and each of them, knew or should have known that [a] their defective AFFF products and components would be used without testing for any hazards. Defendants actually touted that such products were safe, and [b] by placing the products into the stream of commerce without warning or instructions as to the defective and deadly nature of the products, Defendants represented that their AFFF products and components were safe for all intended uses.

78.     Defendants, and each of them are strictly liable for all damages and harm flowing from the defective design, manufacture and distribution of their product.

79.     As a direct and proximate cause of exposure to the Defendants' toxic chemicals, Plaintiff sustained injuries.  Plaintiff's injuries are of the type known by Defendants to be caused by exposure.  Defendants further knew that the latency period between exposure and manifestation of disease had latency period could be years. Moreover, Defendants knew that their actions and statements over many years concerning the viability and safety of the products would prevent the Plaintiff from understanding the true cause of his disease and determining who was liable for his injuries - all in an effort by Defendants to avoid the liability and consequences for their acts and omissions. It has only been recently, late 2019 and into 2020, that the facts have

become somewhat known to the public who had some reason to inquire and who diligently searched such knowledge. Martin did not become aware of facts until mid-Fall 2020.

80.    Defendants acts and omissions, specifically including the years of active concealment of the facts, as well as the failures/refusals to ameliorate the toxic contamination of Defendants' "forever chemicals" in the environment, inclusive of the years' long campaign to conceal the truth was conduct engaged in with an extreme disregard for the health and safety of others, knowing that such disregard was substantially likely to cause foreseeable harm.

81.    As a direct and proximate cause of Defendants, and each of their acts and omissions, Plaintiff sustained injury and is entitled to compensation for all damages for injuries to persons, *i.e.*: under *Cal.Civ.C*., § 3333 (*inter alia*, actual/special damages, consequential damages, future medical care) and pre-judgment interest on economic damages under *Cal.Civ.C*., § 3288 - all to be proven at the time of trial.

82.    Defendants, and each of them, manufactured, sold and/or distributed the AFFF product to military installations in California over the course of years.

83.    It is not presently possible to determine the specific manufacturer in each instance of contamination.

84.    Accordingly, Plaintiff must, and hereby does, seek recovery from all Defendants, jointly and severally.

85.    It is not unjust to so seek in this instance as Defendants, over the course of many years, conspired to conceal the true inherent dangers of the product, the ultra-hazardous nature of the toxic chemicals, and to seek to avoid liability for the

consequences of their defective product - all for Defendants to continue to gain unjust enrichment from the manufacture, sale and distribution of those toxic chemicals.

86.     Defendants, and each of them, acted in concert by engaging in a common plan to engage in the negligent/grossly negligent conduct, inclusive of the acts of concealment so as to continue to sell and profit from the inherently dangerous AFFF products containing the toxic chemical agents/surfactants.  Concert or action liability attaches, as does Enterprise Liability, as Defendants, and each of them were involved in a shared enterprise.  Accordingly, Defendants, and each of them, are jointly and severally liable to Plaintiff.

87.     Defendants, and each of their acts and omissions were engaged in with a conscious and deliberate disregard for the health and safety of others arising from the inevitable risks of harm from their AFFF products and components/formularies containing the toxic surfactants (PFC's/PFAS and/or PFOS) such to be willful or wanton and/or malicious under *Cal.Civ.C.*, § 3294, thereby warranting, in addition to any other award, punitive damages in an amount to be determined at time of trial.

## THIRD CAUSE OF ACTION

(*Defective Product/Design Defect-Consumer Expectations*)

88.     Plaintiff respectfully realleges and incorporates ¶¶ 1 to 87, inclusive as though set forth at length herein.  Each cause of action is pled in the alternative.

89.     Defendants, and each of them, at all times relevant hereto, were engaged in interstate commerce in designing, manufacturing, marketing, selling and/or distributing the AFFF product and components containing PFC's, including but not limited to PFAS and/or PFOS.

90.     Defendants, and each of them, at all times relevant hereto, had duties and obligations to assure that their products were free from defect and did not pose an unreasonably dangerous condition to persons that would foreseeably come in contact with the product, either directly or indirectly, *i.e.*: use as intended or as an aftermath of use (environment - air, soil, water).

91.     Defendants, and each of them breached those duties and obligations in that the AFFF and components for AFFF (surfactants) containing PFC's - PFAS/PFOS that each designed, manufactured, marketed, sold and/or distributed were inherently/unreasonably dangerous, which was unknown to and not contemplated by any user or member of the public when the product was used in its intended and foreseeable manner.   Further unknown and not contemplated by consumers and public were the consequences to the environment (air, soil, water) and thus to humans, from the use of the products.

92.     In addition to the above duties and obligations, Defendants, and each of them in placing the products into the stream of commerce became guarantors as to the products and vouched for the safety of the products.

93.     Defendants, and each of them, at all times relevant hereto, knew or should have known:

        [a]     that the surfactants used in the design, manufacture, marketing, sale and/or distribution of the AFFF product and components were toxic and posed a foreseeable risk to all exposed (whether directly from use or from environmental contamination) for severe medical impacts, including cancer and other serious diseases;

24

[b]    that the subject fire-fighting foam products, due to the surfactant formulation containing PFC's (PFAS, PFOS and like chemicals), were far more dangerous than an ordinary consumer of the product would reasonably expect (or upon the exercise of due diligence could discover) when using the product in its intended manner or in its reasonably foreseeable manner;

[c]    that the fire-fighting foam containing the "forever chemicals" did not degrade and had high mobility in soil which in turn contaminated water/water supplies which posed unreasonable risks to any persons using water supplies, which persons were or would have been completely unaware of the unreasonable/inherent dangers; and,

[d]    that risks arising from Defendants' products were not obvious to users or any humans coming in contact with products whether directly or indirectly (environmental contamination), nor could users or members of the public, specifically including Plaintiffs, have reasonably discovered the consequences arising directly from the use of the products, directly or indirectly nor could they protect themselves from any exposure to the inherently/unreasonably dangerous toxic chemicals.

94.    The AFFF fire-fighting foam and components/formularies containing the toxic "forever chemicals" as designed, manufactured, marketed, sold and/or distributed by Defendants, and each of them, were in a defective condition and thereby inherently/unreasonably dangerous to an extent well beyond that which would be reasonably contemplated by an end user or the public at large, even when used in an

intended and/or reasonably foreseeable manner, *i.e.*: including, but not limited to the toxic effects on the environment (air, soil, water).

95.     It was foreseeable to Defendants, and each of them that use of their defective AFFF products and components/formularies could cause severe harm to humans, whether to direct users of the products or to those who were reasonably within proximity to any contaminated air, soil or water supply.

96.     Defendants, and each of their AFFF products and components/ formularies using toxic surfactants (PFC's - PFAS, PFOS and/or similar chemicals) were defective in that they were inherently dangerous to humans even when used as intended.

97.     As a direct and proximate result of Defendants, and each of their placing defective products into the stream of commerce without warning consumers, users and the public of the potential devastating consequences to the environment (air, soil and/or water supply) and to human health, Plaintiff has sustained damage and injury (kidney cancer/nephrectomy) from exposure to Defendants' and each of their toxic products.

98.     As a direct and proximate cause of exposure to the Defendants' toxic chemicals, Plaintiff sustained injuries.   Plaintiff's injuries are of the type known by Defendants to be caused by such exposure - kidney cancer/removal.  Defendants further knew that the latency period between exposure and manifestation of disease that could last for years.  Moreover, Defendants knew that their actions and statements over many years concerning the viability and safety of the products would prevent the Plaintiff from understanding the cause of his disease and determining who was liable for his injuries - all in an effort by Defendants to avoid the liability and consequences for their acts and omissions. It has only been recently, late 2019 and into 2020, that the facts have become

somewhat known to the public who had some reason to inquire and who diligently searched such knowledge. Plaintiff did not become aware of facts until Fall 2020.

99.    Defendants engaged in acts and omissions, including the years of active concealment of the facts, and the failures/refusals to ameliorate to toxic contamination of Defendants' "forever chemicals" in the environment.  In aggravation, Defendants engaged in the years' long campaign to conceal the truth. Such conduct was conduct engaged in by Defendants with a conscious and deliberate disregard for the health and safety of others, knowing that such disregard was substantially likely to cause foreseeable harm.

100.    As a direct and proximate cause of Defendants, and each of their acts and omissions, Plaintiff sustained injury and is entitled to compensation for all damages for injuries to Plaintiff, *i.e.*: under *Cal.Civ.C.*, § 3333 (*inter alia*, actual/special damages, consequential damages, future medical care) and pre-judgment interest on economic damages under *Cal.Civ.C.*, § 3288, as shall be proven at the time of trial.

101.    Defendants, and each of them, manufactured, sold and/or distributed the AFFF product to military installations in California over the course of years.  It is not presently possible to determine the specific manufacturer in each instance of contamination.  Accordingly, Plaintiff must, and hereby does, seek recovery from all Defendants, jointly and severally.  It is not unjust to seek joint and several liability in this instance as Defendants, over the course of many years, conspired to conceal the true inherent dangers of the products, the ultra-hazardous nature of the toxic chemicals, and to seek to avoid liability for the consequences of their defective products - all for Defendants to continue to gain unjust enrichment from the manufacture, sale and distribution of those toxic chemicals.

102.    Defendants, and each of them, acted in concert by adopting a common plan to engage in the negligent/grossly negligent conduct, inclusive of the acts of concealment so as to continue to sell and profit from the inherently dangerous AFFF products containing the toxic chemical agents/surfactants.  Concert of action liability attaches, as does Enterprise Liability, as Defendants, and each of them were involved in a shared enterprise.  Accordingly, Defendants, and each of them, are jointly and severally liable to Plaintiff.

103.    Defendants, and each of them, under the facts set forth in this action, are strictly liable for their acts and/or omissions.

104.    Defendants, and each of their acts and omissions were engaged in with a conscious and deliberate disregard for the health and safety of others arising from the inevitable risks of harm from their AFFF products and components/formularies containing the toxic surfactants (PFC's/PFAS and/or PFOS) such to be willful and wanton, thereby warranting, in addition to any other award, punitive and exemplary damages in an amount to be determined at time of trial.

## FOURTH CAUSE OF ACTION

*(Defective Product/Design Defect-Risk/Utility)*

105.    Plaintiff respectfully realleges and incorporates ¶¶ 1 to 104, inclusive as though set forth at length herein.  Each cause of action is pled in the alternative.

106.    Defendants, and each of them, at all times relevant hereto, were engaged in interstate commerce in designing, manufacturing, marketing, selling and/or distributing the AFFF product and components containing PFC's, including but not limited to PFAS and/or PFOS.

107.    Defendants, and each of them, at all times relevant hereto, had duties and obligations to assure that their products were free from defect and did not pose an unreasonably dangerous condition to persons that would foreseeably come in contact with the product, either directly or indirectly, *i.e.*: use as intended or as an aftermath of use (environment - air, soil, water).

108.    Defendants, and each of them breached such duties and obligations in that the AFFF and components for AFFF (surfactants) containing PFC's - PFAS/PFOS that each designed, manufactured, marketed, sold and/or distributed were inherently / unreasonably dangerous, which was unknown to and not contemplated by any user or member of the public when the product was used in its intended and foreseeable manner. Further unknown and not contemplated by consumers and public were the consequences to the environment (air, soil, water) and thus to humans, from the use of the products.

109.    In addition to the above duties and obligations, Defendants, and each of them in placing the products into the stream of commerce became guarantors as to the products and vouched for the safety of the products.

110.    Defendants, and each of them, at all times relevant hereto, knew or should have known:

> [a]    their AFFF products and components/formularies when placed by them into the steam of commerce were defectively designed and manufactured such that the severe consequences of exposure to those "forever chemicals" were foreseeable and well surpassed any purported benefits of the design/formulations;

[b]   their AFFF products and components/formularies (surfactants) when placed by them into the stream of commerce were defectively designed and manufactured such that the severe consequences of exposure to those "forever chemicals" to the environment and to human health were foreseeable and well surpassed any purported utilities of the design/formulations;

[c]   that safe, feasible, reasonable and practical alternatives to the toxic AFFF products and components/formularies were known and that the use of such alternatives would have prevented the toxic contamination of the environment as pled herein, and the ensuing grave and deadly risks of harm to human health as to those who unwittingly came in contact with those toxic "forever chemicals"[1].

111.   Despite that knowledge, Defendants continued to manufacture, market, sell and/or distribute AFFF and components/formularies using the defective design which incorporated/included the "forever chemical" surfactants, *e.g.*: PFC's (PFAS and/or PFOS).

112.   Despite that knowledge, Defendants continued to manufacture, market, sell and/or distribute AFFF and components/formularies using the defective design which incorporated/included the "forever chemical" surfactants, *e.g.*: PFC's (PFAS and/or PFOS) further knowing that their defective products would be received and used by its

---

[1]  Plaintiffs are informed and believe, and on such allege that Defendants, and each of them, now utilize alternative designs for AFFF which do not contain the "forever chemicals" surfactants, which Defendants have stated are technologically feasible and which could have been used during at least a considerable period of time referenced in this action.

customers (including military installations in California) without substantial change in the products' condition as designed, manufactured, marketed, labeled, sold, and/or distributed, including, but not limited to Camp Pendleton.

113.    In aggravation, Defendants, and each of them knowingly failed to adequately warn, inclusive of proper and truthful labeling and instructions, with respect to the extremely high probabilities of severe consequences to the environment and to human health and safety.  *Contra*, Defendants, and each of them engaged in a long-term campaign to conceal the highly toxic "forever chemicals" and the extremely high probabilities of contamination to the environment and the exceedingly high probabilities of harming human health and safety.  In engaging in such acts and omissions, Defendants, and each of them acted with a conscious and deliberate disregard for the health and safety of others, doing so with knowledge of the dangerous consequences of their "forever chemicals".  In further aggravation, Defendants, and each of them willfully and deliberately failed to avoid those consequences.

114.    Defendants, and each of their AFFF products and components/ formularies using toxic surfactants (PFC's - PFAS, PFOS and/or similar chemicals) were defective.

115.    As a direct and proximate result of Defendants, and each of them placing their defective products into the stream of commerce without warning to consumers, users and the public of the devastating consequences to the environment (air, soil and/or water supply) and to human health, Plaintiff has sustained damage and injury from exposure to Defendants' and each of their toxic products.

116.    As a direct and proximate cause of exposure to the Defendants' toxic chemicals, Plaintiff sustained injuries.  Plaintiff's injuries are of the type known by

Defendants to be caused by exposure, namely kidney cancer/removal. Defendants further knew that the latency period between exposure and manifestation of disease could be years. Moreover, Defendants knew that their actions and statements over many years concerning the viability and safeness of the products would prevent the Plaintiffs from understanding (even with the exercise of due diligence) the cause of their disease and determining who was liable for their injuries - all in an effort by Defendants to avoid the liability and consequences for their acts and omissions. It has only been recently, late 2019 and into 2020, that the facts have become somewhat known to the public who had some reason to inquire and who diligently searched such knowledge. Here, Plaintiff Martin did not become aware of facts until about mid-Fall 2020.

117.    Defendants acts and omissions, specifically including the years of active concealment of the facts, as well as the failures/refusals to ameliorate the toxic contamination of Defendants' "forever chemicals" in the environment, inclusive of the years' long campaign to conceal the truth was conduct engaged in with a conscious and deliberate disregard for the health and safety of others, knowing that such disregard created a substantial likelihood of foreseeable harm.

118.    As a direct and proximate cause of Defendants, and each of their acts and omissions, Plaintiff sustained injury and is entitled to compensation for all damages for injuries to Plaintiff, *i.e.*: under *Cal.Civ.C.*, § 3333 (*inter alia*, actual/special damages, consequential damages, future medical care) and pre-judgment interest on economic damages under *Cal.Civ.C.*, § 3288, as shall be proven at the time of trial.

119    Defendants, and each of them, manufactured, sold and/or distributed the AFFF product to military installations in California over the course of years, including

Camp Pendleton.  It is not presently possible to determine the specific manufacturer in each instance of contamination.  Accordingly, Plaintiff must, and hereby does seek recovery from all Defendants, jointly and severally.  Joint and several liability is warranted in this instance as Defendants, over the course of many years, conspired to conceal the inherent dangers of their products, the ultra-hazardous nature of the toxic chemicals, and to seek to avoid liability for the consequences of their defective product - all for Defendants to continue to gain unjust enrichment from the manufacture, sale and distribution of those toxic chemicals.

120.    Defendants, and each of them, acted in concert by adopting a common plan to engage in the negligent/grossly negligent conduct, inclusive of the acts of concealment so as to continue to sell and profit from the inherently dangerous AFFF products containing the toxic chemical agents/surfactants.  Concert of action liability attaches, as does Enterprise Liability, as Defendants, and each of them were involved in a shared enterprise.  Accordingly, Defendants, and each of them, are jointly liable and severally to Plaintiff.

121.    Defendants, and each of them, under the facts set forth in this action, are strictly liable for their acts and/or omissions.

122.    Defendants, and each of their acts and omissions were engaged in with a conscious and deliberate disregard for the health and safety of others arising from almost inevitable risks of harm from their AFFF products and components / formularies containing the toxic surfactants (PFC's/PFAS and/or PFOS) such to be willful or wanton, thereby warranting, in addition to any other award, punitive and exemplary damages as shall be proven be at time of trial.

## FIFTH CAUSE OF ACTION

### (*Defective Product-Failure to Warn*)

123.    Plaintiff respectfully realleges and incorporates ¶¶ 1 to 122, inclusive, as though set forth at length herein, including all exhibits.  Each cause of action is pled in the alternative.

124.    Defendants, and each of them, at all times relevant hereto, were engaged in interstate commerce in designing, manufacturing, marketing, selling and/or distributing the AFFF product and components containing PFC's, including but not limited to PFAS and/or PFOS.

125.    Defendants, and each of them, at all times relevant hereto, knew or should have known:

[a]    their AFFF products and components/formularies when placed by them into the steam of commerce were defectively designed and manufactured such that the severe potential consequences of exposure to those "forever chemicals" were foreseeable and well surpassed any purported benefits of the design/formulations;

[b]    their AFFF products and components/formularies (surfactants) when placed by them into the stream of commerce were defectively designed and manufactured such that the severe potential consequences of exposure to those "forever chemicals" to the environment and to human health were foreseeable and well surpassed any purported utilities of the design/formulations; and,

[c]    that safe, feasible, reasonable and practical alternatives to the toxic AFFF products and components/formularies were known and that the use of such

alternatives would have prevented the toxic contamination of the environment as pled herein, and the ensuing grave and deadly risks of harm to human health as to those who unwittingly came in contact with those toxic "forever chemicals".

126.    Defendants knew that AFFF contained toxic chemical agents, including, but not limited to PFC's/PFAS and/or PFOS.  Defendants knew that those chemical agents would infect the environment when used as intended.  Defendants knew that those chemical agents did not degrade and would contaminate the environment for years and decades.  Defendants knew that human exposure to the toxic chemicals (by use, by dermal contact, by soil contamination and/or by water contamination) posed a severe risk of harm to humans so exposed.  Defendants knew that exposure to the toxic chemicals posed a significant risk to humans for such diseases as cancer, birth defects, and autoimmune disease. Defendants knew there was a direct causal connection from exposure to the toxic chemicals and impairment of human health. Said defects were not obvious nor readily recognizable nor for even capability of discovery to the users of the product nor to the public, including personnel located at or near California military installations where the defective products were used, with respect to environmental contamination of soil and/or water supplies

127.    Defendants knew that their "forever chemicals" posed a substantial danger of harm, including, but not limited to:

[a]     that their toxic "forever chemicals" were an extreme biohazard, specifically including the "forever chemicals" inability to break down/ degrade in the environment which permitted the chemicals to remain for years, if not decades, their toxic "forever chemicals" abilities to travel through air, water and soil once

introduced into the environment, their toxic "forever chemicals" ability to be absorbed into the human body in multiple manners (consumption, inhalation, dermal), and their toxic "forever chemicals" ability to build up in the human body with each exposure, including toxic build ups/accumulations in blood stream/ serums, liver and kidneys;

[b]     that their toxic "forever chemicals" accumulated into the blood of humans and that the toxic compounds affected a wide portion of the population in general (who had been exposed via use and/or soil or water contamination), including the fact that each exposure stacked up in the human body.

[c]     that exposure to their toxic "forever chemicals" posed a substantial danger of increased birth defects;

[d]     that exposure to their toxic "forever chemicals" posed a substantial danger of increased adverse liver enzyme impacts;

[e]     that exposure to their toxic "forever chemicals" posed a substantial danger of testicular cancer;

[f]     that exposure to their toxic "forever chemicals" posed a substantial danger of liver cancer;

[g]     that exposure to their toxic "forever chemicals" posed a substantial danger of pancreatic cancer;

[h]     that exposure to their toxic "forever chemicals" posed a substantial danger of high cholesterol;

[i]     that exposure to their toxic "forever chemicals" posed a substantial danger of adverse thyroid changes;

[j]    that exposure to their toxic "forever chemicals" posed a substantial danger of adverse autoimmune issues;

[k]    that exposure to their toxic "forever chemicals" posed a substantial danger of pre-eclampsia;

[l]    that exposure to their toxic "forever chemicals" posed a substantial danger of ulcerative colitis;

[m]    that exposure to their toxic "forever chemicals" posed a substantial danger of multiple sclerosis; and,

[n]    that exposure to their toxic "forever chemicals" posed a substantial danger of kidney disease;

128.    Defendants knew that the toxicity of the chemicals was extreme/ultra-hazardous when used for their intended purposes (including firefighting).   It was understood by Defendants that the manifestations of disease could be many years after original exposure to the chemicals.   Moreover, Defendants knew that the chemicals design permitted their toxicity to remain a bioaccumulation threat with severe physical adverse effects as above for years, if not decades, in each place where the chemicals were used as intended, *i.e.*: a known significant potential latency period.

129.    For example, California has numerous military installations of which some 29 have been identified with PFC (PFAS and/or PFOS) contamination (soil/water), many of which installations were active during at least the 1960's forward.   Thousands, if not tens of thousands, of military and civilian personnel were stationed at those posts/bases during that time period with risk of exposure to those ultra-hazardous chemicals. Camp Pendleton was and is one of those contaminated installations.   As the defect of the toxic

"forever chemicals" was not obvious to users or to members of the public who were exposed to it, Plaintiff did not know, nor could he have reasonably discovered the true cause of the harm he sustained. Only recently, late 2019, have the consequences of Defendants' toxic "forever chemicals" become even somewhat known to and capable of reasonable understanding by the general public exercising due diligence to discover same. In aggravation, Defendants engaged in active campaigns to conceal the true facts of the toxic forever chemicals. Here, Plaintiff Martin did not discover even initial inquiry facts until Fall 2020.

130. Defendants continued to manufacture, sell, and distribute AFFF containing the toxic "forever chemicals" (including, PFC/PFAS and/or PFOS). At all times relevant hereto, Defendants had knowledge, or by the application of reasonable skill and foresight should have had knowledge of the defect and the danger, inclusive of from Defendants' own research and investigation (which was concealed). In aggravation, for years, Defendants not only concealed the true ultra-hazardous nature of the chemicals and the severe adverse health consequences from exposure; Defendants publicly maintained that there were no problems with products and that the products were safe.

131. Defendants, and each of them had a duty to provide adequate warnings and instructions concerning their AFFF products and components containing the toxic "forever chemicals" (PFC/PFAS, PFOS and related compounds) (surfactants) because the intended use of the product involved a substantial danger not readily recognizable by anyone other than a trained scientist with access to the proprietary knowledge of the Defendants, *i.e.*: a non-obvious defect/danger. The harm, being either known to or reasonably foreseeable to Defendants, thus required adequate warnings and/or

instructions. Defendants, having such actual or constructive knowledge (including, but not limited to their own research and investigations), are not only subject to strict liability for defective design of a chemical, Defendants are also strictly liable for failure to adequately warn.

132. Defendants, and each of them also had a duty to provide adequate post-sale warnings and instruction because:

[a]    Defendants knew or reasonably should have known that the "forever chemicals" posed a substantial risk of severe harm to humans that unwittingly came in contact with those chemicals;

[b]    Defendants knew or should have reasonably known whom to provide proper warning and that it was reasonable to presume that those entitled to proper warning were unaware of the risk of harm, and even though due diligence could not have reasonably disclosed;

[c]    Defendants knew or should have known that a proper warning could be reasonably communicated to and acted upon by the recipients; and,

[d]    Defendants knew or should have known that the risk of harm to humans from the "forever chemicals" was so great as to warrant the burden of providing proper warnings.

133. As alleged above, Defendants knew, from their own research and investigations, the PFC's (PFAS/PFOS) contained in the "forever chemicals" in fact caused harm to the environment (air, soil, water) and posed an inevitable risk of harm to humans, including, but not limited to cancers, birth defects, kidney disease and autoimmune disease.

134.    In aggravation, Defendants, and each of them knowingly failed to adequately warn, inclusive of proper and truthful labeling and instructions, with respect to the extremely high probabilities of severe consequences to the environment and to human health and safety.  *Contra*, Defendants, and each of them engaged in a long-term campaign to conceal the highly toxic "forever chemicals" and the extremely high probabilities of contamination to the environment and the exceedingly high probabilities of harming human health and safety.

135.    In engaging in such acts and omissions, Defendants, and each them, acted with a conscious and deliberate disregard for the health and safety of others, doing so with knowledge of the dangerous consequences of their "forever chemicals".  In further aggravation, Defendants, and each of them willfully and deliberately failed to avoid those consequences.

136.    Defendants, and each of their AFFF products and components/ formularies using toxic surfactants (PFC's - PFAS, PFOS and/or similar chemicals) were defective.

137.    As a direct and proximate result of Defendants, and each of their placing their defective products into the stream of commerce without warning consumers, users and the public of the potential devastating consequences to the environment (air, soil and/or water supply) and to human health, Plaintiff has sustained damage and injury from exposure to Defendants' and each of their toxic products.

138.    As a direct and proximate cause of exposure to the Defendants' toxic chemicals, Plaintiff sustained injuries.  Plaintiffs' injuries are of the type known by Defendants to be caused by exposure - kidney cancer.  Defendants further knew that the latency period between exposure and manifestation of disease could extend for years.

Moreover, Defendants knew that their actions and statements over many years concerning the viability and safeness of the products would prevent the Plaintiff from understanding the cause of his disease and determining who was liable for his injuries - all in an effort by Defendants to avoid the liability and consequences for their acts and omissions. It has only been recently, late 2019 and into 2020, that the facts have become somewhat known to the public who had some reason to inquire and who diligently searched such knowledge. Plaintiff did not become aware of facts until Fall 2020.

139.    Defendants acts and omissions, specifically including the years of active concealment of the facts, as well as the failures/refusals to ameliorate to toxic contamination of Defendants' "forever chemicals" in the environment, inclusive of the years' long campaign to conceal the truth was conduct engaged in with a conscious and deliberate disregard for the health and safety of others, knowing that such disregard would inevitably cause foreseeable harm.

140.    As a direct and proximate cause of Defendants, and each of their acts and omissions, Plaintiff sustained injury and is entitled to compensation for all damages for injuries to him, *i.e.*: under *Cal.Civ.C.*, § 3333 (*inter alia*, actual/special damages, consequential damages, future medical care) and pre-judgment interest on economic damages under *Cal.Civ.C.*, § 3288 - as shall be proven at the time of trial.

141.    Defendants, and each of them, manufactured, sold and/or distributed the AFFF product to military installations in California over the course of years.  It is not presently possible to determine the specific manufacturer in each instance of contamination.  Accordingly, Plaintiff must, and hereby does, seek recovery from all Defendants, jointly and severally.  It is not unjust to seek such relief in this instance as

Defendants, over the course of many years, conspired to conceal the true inherent dangers of the product, the ultra-hazardous nature of the toxic chemicals, and to seek to avoid liability for the consequences of their defective product - all for Defendants to continue to gain unjust enrichment from the manufacture, sale and distribution of those toxic chemicals.

142.    Defendants, and each of them, acted in concert by adopting a common plan to engage in the negligent/grossly negligent conduct, inclusive of the acts of concealment so as to continue to sell and profit from the inherently dangerous AFFF products containing the toxic chemical agents/surfactants.  Concert of action liability attaches, as does Enterprise Liability, as Defendants, and each of them were involved in a shared enterprise.  Accordingly, Defendants, and each of them, are jointly liable to Plaintiff.

143.    Defendants, and each of them, under the facts set forth in this action, are strictly liable for their acts and/or omissions.

144.    Defendants, and each of their acts and omissions were engaged in with a conscious and deliberate disregard for the health and safety of others arising from the almost inevitable risks of harm from their AFFF products and components/formularies containing the toxic surfactants (PFC's/PFAS and/or PFOS) such to be willful or wanton, thereby warranting, in addition to any other award, punitive and exemplary damages in an amount to be proved at time of trial.

///

///

## SIXTH CAUSE OF ACTION

### (*Fraud by Concealment*)

145.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.  Each cause of action is pled in the alternative.

146.    In or about 2001, led by Dupont, the remaining Defendants (excluding 3M and including National Foam, Kidde 1, Kidde 2, Fenwall, Tyco, Buckeye, Chemguard, Dynax, Chemours 1, Chemours 2 and DOES) formed the Fire Fighting Foam Coalition ("FFFC") whose purpose was to continue the manufacture (inclusive of feedstock), sale and distribution of AFFF containing fluorosurfactants.

147.    FFFC was an information and business enterprise dedicated to the continuation of the use of AFFF and to the on-going protection of its members against any problems/liabilities which would occur in the event their clients, the government and the general population learned the truth about fluorosurfactants such as PFAS and/or PFOS as used in Defendants' AFFF.

148.    Members of FFFC also shared (amongst themselves) data and information regarding the toxicity of the compounds.  Accordingly, FFFC was also dedicated keeping all of the adverse facts secret and parrying any inquiries, so as to allay any apprehensions as to environmental and/or human impacts. FFFC was designed and managed so as to actively conceal adverse facts from regulators and the public by Defendants' intentional dereliction of their legal duties.

149.    Throughout the relevant time period, Defendants knew that their products were defective and unreasonably unsafe for their intended purpose.

150.    Defendants fraudulently concealed from and/or failed to disclose to or warn the Plaintiff and the public that their products were defective, unsafe, and unfit for the purposes intended, and that they were not of merchantable quality, *e.g.*: that their product was in fact highly toxic, would not break down over time to avoid on-going toxicity and contamination (the product was given the sobriquet of "the forever chemical"), was highly mobile such to contaminate soil, water and humans by use of the product and by using/drinking contaminated water whereby the forever chemicals built up in the human system thus creating the known elevated risks of cancer and disease.

151.    Defendants were under a duty to the Plaintiff and to the public to disclose and warn of the defective and harmful nature of the products because:

a)    Defendants were in a superior position to know the true quality, safety and efficacy of the Defendants' products;

b)    Defendants knowingly made false claims about the safety and quality of the Defendants' product in documents and marketing materials; and

c)    Defendants fraudulently and affirmatively concealed the defective nature of the Defendants' products from the Plaintiff.

152.    In gross aggravation, Defendants intentionally and knowingly violated their duties to disclose and warn of the defective and harmful nature of their products and components (chemical feedstock) by publishing, inclusive of through the FFFC, false information designed and intended to conceal the adverse facts of their toxic forever chemicals as contained in their AFFF products.

153.    In further gross aggravation, Defendants deliberately and knowingly misrepresented the true facts of their products.  Defendants had actual knowledge of,

*inter alia*, [a] the toxicity of the forever chemicals in their products, [b] that the products were ultra-hazardous and contaminated the environment: soil and water, [c] that the products accumulated in the human system from direct use, indirect contact and from use of contaminated water, and [d] created a significant risk of causing serious injury to humans, *e.g.*: cancers and other diseases. Defendants were under an affirmative duty to fully disclose, *i.e.*: a partial disclosure with concealment of other known adverse facts is fraudulent concealment. *Contra*, over the years Defendants made material misrepresentations of fact, for example:

> *Standardized tests are conducted as an ongoing program to evaluate and assess the impact of 3M Brand AFFF on humans and the natural environment Based on test results, 3M Brand AFFF is biodegradable, low in toxicity and can be treated in biological treatment systems. In its concentrate form, 3M Brand AFFF was found to be a slight eye and skin irritant, but as a foam solution, there are no noticeable negative effects. Tests and actual use situations have shown that animal and aquatic life are not adversely affected. AFFF Technical Information FC-783, 1989 (Ex. 1359, Minn v 3M, 27-CV-10-28662) [At the time, people were directed to regional offices, including Los Angeles and San Francisco]. Ibid.*

> *Currently approved AFFF agents are safe for their intended uses, provide unsurpassed performance, and contrary to recent reports do not present an environmental hazard when properly used, suggests Tom Cortina of the Firefighting Foam Coalition. IFJ, June 2007.*

> *Firefighting foams that contain fluorotelomer surfactants stand on a substantial foundation of scientific data. They are the most effective agents currently available to fight flammable liquid fires and are safe for their intended uses in military, industrial, and municipal settings. The suggestion that fluorine free alternatives are safer and environmentally superior is simply not based on available science... IFJ, April 2008 (Note: the Article was followed by a large color advertisement for FFFC stating its' members are manufacturers, distributors and users of aqueous film-forming foam (AFFF) fire-fighting agents and their chemical components [e.g.: Dynax]).*

> *[T]he fluorosurfactants used in currently manufactured AFFF agents are persistent, but are not considered to be significant environmental toxins. IFJ, June 2005.*

> *///*

*In my (Tom Cortina of FFFC) last article that was co-authored by Dr. Stephen Korzeniowski of DuPont (June 2008 issue) we reviewed all of the latest science related to the environmental effects of fluorosurfactants. Since that article there has been a new study published by SFT related to fluorochemicals found at fire training facilities in Norway. Although the study does not contain any new conclusions, it has drawn interest within the foam industry. The SFT study confirms the findings of previous studies that the likely ultimate biodegradation products of the fluorosurfactants used in currently manufactured AFFF agents are persistent but are not considered to be significant environmental toxins. Pacific Fire, April 2011.*

154.   The above statements are untrue and/or concealment of the known to Defendants true facts, as set forth in the preceding causes of action.  As to C6, the main difference seems to be that C6 has a shorter half-life in the human body than C8, which does not translate to the environment.   In a 2010 report to the EPA DuPont (FFFC member) reported that the "biodegradation of the test substance was 0%" for C6.  Case studies on C6 have found that while C6 has a shorter half-life than C8, the overall toxicity and potency of the chemicals were the same, *e.g.*: that C6 caused more or less the same injuries as C8.

155.   In further gross aggravation, Defendants deliberately and knowingly acted with the express intention to violate their duties to disclose and warn, to misrepresent the adverse facts, to conceal the adverse facts, and to deceive, *inter alia*, the federal government, the State of California, and the people residing in the State of California, inclusive of upon and/or in the vicinity of United States military installations (inclusive of National Guard and Reserve), including Plaintiff herein.

156.   In further gross aggravation, Defendants, inclusive of through the FFFC, deliberately and knowingly directed their misrepresentations/concealments of material facts to California and to the people thereof with the intent to deceive said people, including Plaintiff herein, all to Defendants' planned unjust enrichment emanating from

46

California. Defendants thereby purposely availed themselves of the privilege of conducting business activities within California and this claim arises out of or related to those activities.   Accordingly, Defendants engaged in tortious wrongs in California, *ergo* jurisdiction and venue is proper in California.

157.   As a direct and proximate cause of Defendants' acts of fraud/fraudulent concealment, Plaintiff was deceived in California as to the true facts of Defendants' products, *inter alia*, the highly toxic nature of the "forever chemical" and the great risk of harm posed to Plaintiff, a person residing in California, in or near a military installation that was/is contaminated with Defendants' toxic chemicals, *e.g.*: AFFF.

158.   Plaintiff sustained injury, namely kidney cancer, as a direct and proximate result of AFFF poisoning from a California military installation upon which Plaintiff served, as shown by, *inter alia*, elevated levels of the subject toxic contaminants in his blood serum.   As intentionally planned and actively executed by Defendants, Plaintiff was wrongfully prevented and deceived from learning of the ultra-hazardous nature of Defendants' toxic products and was wrongfully prevented and deceived from learning that Defendants' toxic chemicals as contained in AFFF were known to Defendants to be a likely causation to the type of injury suffered by Plaintiff.

159.   As a direct and proximate cause of Defendants, and each of their acts and omissions, Plaintiff sustained injury and is entitled to compensation for all damages for injuries to persons, *i.e.*: under *Cal.Civ.C.*, § 3333 *inter alia*, actual/special damages, consequential damages, future medical care) and pre-judgment interest on economic damages under *Cal.Civ.C.*, § 3288 - all to be proven at the time of trial.

///

160.    It is not presently possible to determine the specific Defendant in each instance of contamination and fraud. Accordingly, Plaintiff must, and hereby does, seek recovery from all Defendants, jointly and severally. Further, the full nature and extent of Defendants' misrepresentations and fraudulent concealments are known only to Defendants, which knowledge Defendants knowingly and actively concealed over many years.   Discovery will be required to gain all of the true facts and establish the misrepresentations and acts of concealment.

161.    It is not unjust to so seek in this instance as Defendants, over the course of many years, conspired to conceal the true inherent dangers of the product, the ultra-hazardous nature of the toxic chemicals, and to seek to avoid liability for the consequences of their defective product - all for Defendants to continue to gain unjust enrichment from the manufacture (inclusive of feed stock), sale and distribution of those toxic chemicals.

162.    Defendants, and each of them, acted in concert by engaging in a common plan to engage in the fraudulent conduct, inclusive of the acts of concealment, so as to continue to sell and otherwise profit from the inherently dangerous AFFF products containing the toxic chemical agents/surfactants.  Concert of action liability attaches, as does Enterprise Liability, as Defendants, and each of them were involved in a shared enterprise, inclusive of the FFFC.  Accordingly, Defendants, and each of them, are jointly and severally liable to Plaintiff.

163.    Defendants' acts and omissions were engaged in with a conscious and deliberate disregard for the health and safety of others arising from the inevitable risks of harm from their AFFF products and components/formularies containing the toxic

surfactants (PFC's/PFAS and/or PFOS) such to be willful or wanton, oppressive, fraudulent and/or malicious conduct under *Cal.Civ.C.*, § 3294, thereby warranting, in addition to any other award, punitive and exemplary damages in an amount to be determined at time of trial.

## SEVENTH CAUSE OF ACTION

(*Unfair Competition/Cal.B&P* §§ 17200, *et seq.*)

164.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.  Each cause of action is pled in the alternative.

165.    *Cal.B&P* §17200 *et seq*, was enacted to prohibit any "unlawful, unfair or fraudulent business act or practice" and any "unfair, deceptive, untrue or misleading advertising"; having as its foundation "the right of the public (the residents of California) to protection from and deceit".

166.    Defendants manufactured (inclusive of feed stock), marketed (inclusive of directed to California) and sold (inclusive of in California) AFFF.  As set forth in this Complaint, Defendants knew that the toxicity of the AFFF forever chemicals was extreme/ultra-hazardous even when used for their intended purposes (including firefighting) and that the chemicals were found to be accumulating in the bloodstream, liver and kidneys of humans and animals in the human food chain.  Further, that the chemicals were being associated with numerous diseases such as cancer (testicular, pancreatic and liver), high cholesterol levels, thyroid changes, autoimmune issues, and pre-eclampsia.

///

167. It was understood by Defendants that the manifestations of disease could occur many years after original exposure to the chemicals. Moreover, Defendants knew that the forever chemicals' design (inclusive of feed stock/compounds) permitted their toxicity to remain a bioaccumulation threat with severe physical adverse effects as above for years, if not decades, in each place where the chemicals were used as intended, *i.e.*: a known significant potential latency period.

168. Defendants were under a duty to the residents of California, inclusive of Plaintiff, to disclose and warn of the defective, ultra-hazardous and harmful nature of the products because:

    a)      Defendants were in a superior position to know the true quality, safety and efficacy of the Defendants' products;

    b)      Defendants knowingly made false claims about the safety and quality of the Defendants' product in documents and marketing materials; and

    c)      Defendants fraudulently and affirmatively concealed the defective nature of the Defendants' products from the Plaintiff.

169. In direct contravention of their duties, inclusive to the residents of California, Defendants knowingly and deliberately concealed the true facts of AFFF's forever chemicals and the ultra-hazardous nature thereof to the environment (soil and water) and the toxic effects of those forever chemicals upon humans (severe disease and cancers) caused by the use of the product (direct or indirect) and/or by use (*e.g.*: drinking, bathing) of water contaminated by the toxic forever chemicals.

///

170.    In gross aggravation, Defendants wrongfully concealed the true facts to unjustly enrich themselves to the severe adverse consequences of the known (to Defendants) risk of disease and cancer to the people of California, including Plaintiff.

171.    In gross aggravation, Defendants marketed AFFF to military installations in California as safe for its intended use when Defendants knew that the product was ultra-hazardous, inclusive of contaminating the soil and water wherever the product was used, and beyond due to the known (to Defendants) highly mobile propensities of the product. Defendants' practices offend established public policy and/or the Defendants' practices are immoral, unethical, oppressive, unscrupulous and/or substantially injurious to Californians who served at, and/or lived at or near military installations in California, including Plaintiff.

172.    Defendants intended that Californians, including Plaintiff, would likely be deceived be Defendants' acts of concealment and false advertising of the product being safe.  Plaintiff, a California resident at the time, was so deceived and used the product, *inter alia*, through drinking and bathing in water contaminated by AFFF while stationed at a California situated military installation.  As a result of the Defendants' deceptive practices, Plaintiff was actually harmed by having elevated serum levels of PFAS in his system and sustaining injury, *to wit*, kidney cancer, a known likely risk of PFAS contamination.  Due to Defendants' deceptive practices, including concealment, Plaintiff was further harmed by being prevented from discovering a cause of injuries.  Plaintiff did not discover facts of the likely PFAS causation of injury until in or about Fall 2020.  The nature and breadth of Defendants' deceptive and fraudulent practices are within the

complete knowledge of said Defendants such that discovery is required to expose the full and complete extent thereof.

173.    The Court properly issues injunctive relief to prohibit the further sale of the ultra-hazardous PFAS products in the State of California so as to protect the people of California from further environmental and physical harm.

174.    Plaintiff is entitled to restitution of all pecuniary losses sustained, inclusive of such losses not fully compensated at law.

175.    Plaintiff is entitled to all attorneys' fees and costs incurred in the prosecution of this claim.

176.    Defendants, and each of their deceptive acts over the course of years were engaged in with a conscious and deliberate disregard for the health and safety of others arising from the inevitable risks of harm from their AFFF products and components/ formularies containing the toxic surfactants (PFC's/PFAS and/or PFOS) such to be willful or wanton and/or malicious under *Cal.Civ.C*., § 3294, thereby warranting, in addition to any other award, punitive damages in an amount to be determined at time of trial.

## EIGHTH CAUSE OF ACTION

### (*Violation of Uniform Voidable Transactions Act*)

177.    Plaintiff respectfully realleges and incorporates ¶¶ 1 to 176, inclusive, as though set forth at length herein.  Each cause of action is pled in the alternative.

178.    In or about the late 1960's, testing by Defendants and some of them, (specifically including 3M and Dupont) began to reveal that PFC compounds (initially regarding PFOA), did not breakdown or degrade after use and would remain in the environment.  Moreover, that the compounds were found to not only be toxic, but the

2:22-cv-03624-RMG     Date Filed 10/19/22     Entry Number 1     Page 53 of 73

toxicity would build up in humans.  Additional testing revealed to Defendants, specifically including 3M and Dupont, that the compounds had higher toxicity than understood from the original testing.  By not later than that time, 3M and at least Dupont, had actual knowledge of defective design in the chemical compounding of its AFFF products, which created a duty to adequately warn and/or to reformulate.  Neither 3M nor Dupont did so and permitted the toxic AFFF to continue to be manufactured, sold and/or distributed knowing its toxic attributes. 3M and Dupont concealed that knowledge from the public.

179.    Further testing, during the 1970's, by 3M and Dupont provided the information that PFOA and PFOS had in fact been found to have accumulated in the blood of humans, specifically employees. During that time, Defendants National Foam and Tyco entered the AFFF market. Defendants also learned that the toxic compounds affected a wide portion of the population (who had been exposed via use and/or soil or water contamination), including the fact that each exposure stacked up in the human body.  Defendants kept this knowledge to themselves, actively concealed the information, and did not notify or warn their clients, the public at large nor even the appropriate government agencies at that time.

180.    Research by Defendants continued (including 3M and Dupont) and by the 1980's provided data that exposure to the subject matter toxic chemicals, (specifically PFOA) resulted in increased birth defects, cancers, and adverse liver enzyme impact in humans.   Defendants continued in their failures and/or refusals to disclose such findings/*indicia*.  Defendants did not report their findings to any public agency, did not publish any such information, and did not notify or warn any clients or the public at large at that time.  Defendants continued their active concealment of the information garnered

from their own studies.  Such studies, on information and belief, were shared with at least Tyco (through Ansul, its predecessor in interest).  Tyco, and Ansul before it, joined in the active concealment of the ultra-hazardous nature of the toxic "forever chemicals".

181.    By the latter 1990's, Defendants, and each of them, knew that PFC's (PFOA and PFOS) were an extreme biohazard, specifically including failure to break/degrade in soil or water which caused the chemicals to remain for years, if not decades, preserving:

[a]      their abilities to travel through air, water and soil once introduced into the environment,

[b]      their ability to be absorbed into the human body in multiple manners (consumption, inhalation, dermal), and

[c]      their ability to build up in the human body with each exposure.

182.    During that time period Defendants Chemguard and Dynax entered the AFFF market (manufacture and sell).  Dynax manufactured and sold the fluorosurfactants and fluorochemicals for the foam agents. Defendant Buckeye entered the AFFF market in the early 2000's.  Dynax and Chemguard joined in the active concealment of the ultra-hazardous nature of the toxic "forever chemicals" and the concerted effort to prevent the public from learning the facts.

183.    Defendants also learned that the toxicity of the chemicals was extreme/ultra-hazardous when used for their intended purposes (including firefighting) and that the chemicals were found to be accumulating in the bloodstream, liver, and kidneys.  Further, that the chemicals were being associated with, amongst others, cancer (testicular, pancreatic and liver), high cholesterol levels, thyroid changes, autoimmune

issues, and pre-eclampsia.  It was understood by Defendants that the manifestations of disease could be delayed many years after original exposure to the chemicals.

184.    Defendants, including 3M, Tyco, Kidde 1, Kidde 2, National Foam, Buckeye, Chemguard, Dynax, UTC, Fenwall, DuPont 1, DuPont 2 and Corteva knew that the chemicals' design permitted their toxicity to remain a bioaccumulation threat with severe physical adverse effects as above for years, if not decades, in each place where the chemicals were used as intended, *i.e.*: a known significant potential latency period.  For example, California has numerous military installations, of which some 29 have been identified with PFC (PFAS and/or PFOS) contamination (soil/water), many of which installations were active during at least the 1960's forward.  Thousands, if not tens of thousands, of military and civilian personnel were stationed at those posts/bases during that time period with risk of exposure to those ultra-hazardous "forever chemicals.  All Defendants continued in the active concealment of the ultra-hazardous nature of the toxic "forever chemicals" and the concerted effort to prevent the public from learning the facts.

185.    Defendants continued to manufacture, sell, and distribute AFFF containing PFC/PFAS and/or PFOS.  Defendants not only concealed the true ultra-hazardous nature of the chemicals and the severe adverse health consequences from exposure; Defendants maintained that there were no problems with products.

186.    In or about 2000, 3M disengaged from the AFFF market by phasing out production of the PFC/PFAS and PFOS agents/products.  In doing so, 3M still publicly maintained that those products were safe.

187.    In or about 2001, led by DuPont (who later assigned assets and liabilities to Corteva), the remaining Defendants (including National Foam, Kidde 1, Kidde 2, Fenwall,

Tyco, Buckeye, Chemguard, and Dynax) formed the Fire Fighting Foam Coalition whose purpose was to continue the manufacture, sale and distribution of AFFF containing fluorosurfactants, as primarily manufactured by DuPont (who essentially took over from 3M). The Fire Fighting Foam Coalition ("FFFC" or "the Enterprise") was a private information and business trade association dedicated to the continuation of the use of AFFF and to the on-going protection of its members against any problems/liabilities which would occur in the event their clients, the government and the general population learned the truth about fluorosurfactants such as PFAS and/or PFOS as used in Defendants' AFFF.

188.   Members of the Enterprise also shared (amongst themselves) data and information regarding the toxicity of the compounds. Accordingly, the Enterprise was also dedicated keeping all of the true facts secret, parrying any inquiries, and to allay any apprehensions as to environmental and/or human impacts. In essence, the Coalition was designed and managed so as to actively conceal the true facts from regulators and the public.

189.   In 2016, the EPA issued a formal Health Advisory finding that PFAs and PFOS constituted a health hazard when found in drinking water in levels in excess of 70 parts per trillion ("ppt").

190.   In 2017, Congress passed a law which authorized the expenditure of $50,000,000 to address PFC (PFAS/PFOS) contamination at military installations, inclusive of bringing in the CDC to perform studies concerning the effects of the toxic compounds on human health.

///

191.    In 2018, the EPA issued a report, which included the recommendation that contamination levels be lowered from 70ppt to 11ppt (PFOA) and 7ppt (PFOS).

192.    As of 2019, California is in the process of having contamination levels lowered to 5.1ppt (PFOA) and 6.5ppt (PFOS).

193.    Due to the years of active concealment and misrepresentations by the Defendants, the Plaintiffs herein injured by AFFF and its toxic compounds could not have discovered facts sufficient to put them on notice of the actual grounds for their injuries nor the parties responsible for those injuries specifically including those members of the armed services.  Plaintiff could not have reasonably discovered and did not discover that the toxic "forever chemicals" was the cause of his harm until Fall 2020.  In aggravation, Defendants were required to adequately warn - and they deliberately did not.  In further aggravation, Defendants were required to adequately warn even post-sale - and they deliberately did not.  *Contra*, Defendants spent decades actively concealing the facts from the public for their own unjust enrichment - at the deliberate expense of the health and safety of the public generally and this Plaintiff specifically.

194.    Defendants DuPont, specifically DuPont 1, in August 2017, merged with Dow Chemical, becoming DowDuPont.  A series of mergers with sub-companies followed, culminating with the creation of new separate companies, namely Defendants DuPont 2, as it had done earlier with Chemours 1 and Chemours 2, which continued to manufacture and sell the toxic "forever chemicals".  In June 2019, DowDupont created Corteva and transferred assets and liabilities to Corteva, also by which Corteva became the parent of DuPont 2.  Also in June 2019, DowDupont changed to DuPont 2.  Said Defendants continued to sell the toxic "forever chemicals" despite their knowledge from

their own internal studies of the ultra-hazardous nature of the toxic "forever chemicals" and the almost certain dire risks of injury to human health and safety from exposure (use, air, soil, water, dermal) to those toxic "forever chemicals". *Contra*, Defendants continued with the decades long campaign to actively conceal the facts from the public for their own unjust enrichment - at the deliberate expense of the health and safety of the public generally and this Plaintiff specifically.

195.    Defendants engaged in the active concealments, misrepresentations, and corporate shell games for the purpose of preventing the public and Plaintiff herein from discovering the truth of the toxic "forever chemicals", the devastating decades long impact on the environment (soil, water), the long latency periods, and the certain risks of severe harm to the health and safety of humans who came in contact with those toxic "forever chemicals" (PFC's | PFAS, PFOS) in the forms of, without limitation, cancer, birth defects, autoimmune disease, kidney disease and liver disease.

196.    As part of the continuing campaign to prevent the discovery of the facts, Defendants continued to fail and refuse to provide adequate warnings and instructions on the products (such as AFFF) and components containing the toxic "forever chemicals" at times of sale and further failed to provide adequate post sale warnings and instructions on the products (such as AFFF) and components containing the toxic "forever chemicals" - as Defendants were required to do and for which they bear strict liability.

197.    Defendants' campaign to conceal, misrepresent, hinder, and delay Plaintiff's discovery of the actual facts was successful, and Plaintiff Martin did not, and could not have reasonably discovered sufficient true facts until Fall 2020.

198.    All such Defendant conduct was specifically designed to avoid or greatly reduce consequences of Defendants' liability for their wrongful acts and omissions. Defendants, in making the transfers herein referenced, intended to hinder, delay and defraud Plaintiffs, including, but not limited to:

[a]    the transfers were to insiders, *i.e.*: to corporate entities (some of the co-Defendants) created by some of the Defendants, for the purpose of hindering, delaying and defrauding Plaintiffs;

[b]    the transfers were done at a time when the Defendants had been sued or threatened with suit; and

[c]    the transfers were made with the transferring debtor knowing that the receiving debtor would incur debts beyond receiving debtor's ability to pay, *e.g.*: Chemours as created by DuPont assumed all DuPont liabilities generally or specifically arising from DuPont's years and tears of selling the toxic "forever chemicals", including all liabilities for environmental contamination and harm to human health and safety.

199.    Plaintiff hereby seeks equitable relief under the California Uniform Voidable Transactions Act.    Plaintiff respectfully requests that this Honorable Court void all transactions of Defendants in violation of the CUVTA.

///

///

## NINTH CAUSE OF ACTION

### (*Medical Monitoring Trust*)

200.    Plaintiff respectfully realleges and incorporates ¶¶ 1 to 199, inclusive, as though set forth at length herein.  Each cause of action is pled in the alternative.  A medical monitoring trust may be sought as a cause of action or as a remedy, depending on individual court discretion.  Accordingly, it is pled herein as a claim, but Plaintiff respectfully reserves the right to designate same as a remedy.

201.    Medical monitoring is available to any Plaintiff who have yet to sustain a present injury as a stand-alone cause of action as the increased risk of developing the diseases and conditions discussed *supra* constitute an injury-in-fact and also as an element of damages associated with Plaintiff.

202.    A claim for medical monitoring requires: (1) exposure greater than normal background levels; (2) to a proven hazardous substance; (3) caused by the defendant's negligence; (4) as a proximate result of the exposure, plaintiff has a significantly increased risk of contracting a serious latent disease; (5) a monitoring procedure exists that makes the early detection of the disease possible; (6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and (7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

203.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFC's would result in the contamination of the water supplies in the vicinity of use, which in turn, through soil mobility, would leach into water systems/wells.

204.   Defendants knew or should have known that exposing humans to PFC-contaminated water would be hazardous to human health and the environment.

205.   Here, the Plaintiff has been exposed to PFOA, PFOS, and potentially other toxic substances at levels greater than normal background levels of PFOS and PFOA, as a direct and proximate result of their use and/or consumption, inhalation or dermal absorption of PFOS and/or PFOA from the Defendants' AFFF products.  As such, the Plaintiff is at an increased risk of developing serious adverse health effects that resulted from the use, storage, and discharge of AFFF, inclusive of further disease.

206.   As described more fully above, PFOA and PFOS exposure leads to the bioaccumulation of PFOA and PFOS in the blood, seriously increasing the risk of contracting serious adverse and latent diseases, including, but not limited to, kidney and testicular cancer and related diseases, liver damage, thyroid disease, ulcerative colitis, immune effects and deficiencies, and/or developmental effects to fetuses during pregnancy or to breastfed infants, as a result of being exposed to PFOS and/or PFOA emitted from each Defendant's products. See, *inter alia*, C8 Science Panel Report. Medical tests currently exist that can determine the level of PFOS and PFOA in the blood.

207.   Given that exposure to and bioaccumulation of PFOA and PFOS significantly increases the risk of contracting a serious medical condition, periodic medical examinations to detect latent diseases are both reasonable and necessary. A thorough medical monitoring plan, following common and accepted medical practices, can and should be developed for the Plaintiffs to assist in the early detection and beneficial treatment of the diseases that can develop as a result of exposure to PFOS and PFOA.

///

208.    Medical monitoring and testing protocols and procedures exist that make the early detection of the diseases correlated to the exposure to PFOS and PFOA possible and beneficial. These may include a comprehensive medical questionnaire completed by the patient; periodic and comprehensive medical examinations by qualified licensed medical professionals; and specific testing based on the patient's history, PFOS and/or PFOA exposure, symptoms or health consequences, clinical considerations and/or medical examination results. Available laboratory testing includes but is not limited to testing of biomarker and organ system function.

209.    For the early detection of the latent diseases alleged herein, the qualified licensed medical professionals may utilize specific evaluations and/or laboratory testing of biomarker and organ system function as follows:

a.    Thyroid function:

(1)    Thyroid stimulating hormone (TSH); and

(2)    Free thyroxine (FT4)

b.    Liver function:

(1)    Albumin;

(2)    Aspartate Aminotransferase (AST/SGOT);

(3)    Alanine Aminotransferase (ALT/SGPT);

(4)    γ-glutamyl transferase (GGT);

(5)    Bilirubin; and

(6)    Alkaline Phosphatase

c.    Uric Acid:

(1)    Serum

d.    Kidney Cancer:

(1)    Urinalysis

e.    Lipids:

(1)    Total cholesterol;

(2)    High-density lipoprotein (HDL);

(3)    Low-density lipoprotein (LDL); and

(4)    Total triglycerides

f.    Evaluation for testicular cancer:

(1)    Scrotal   ultrasound   followed   by   radiographic   testing, measurement of serum tumor markers;

(2)    Radical inguinal orchiectomy; and/or

(3)    Retroperitoneal lymph node dissection

g.    Evaluation for kidney cancer:

(1)    Urine culture;

(2)    Ultrasound of kidneys;

(3)    Abdominal pelvic CT scan; and/or

(4)    Cystoscopy

h.    Reproductive/infertility issues:

(1)    Evaluation by a fertility specialist if, after 12 months, a couple has failed to conceive

///


///

    i.    Gestational hypertension:

        (1)    Screening for evidence of gestational hypertension and pre-eclampsia for women in their second and third trimesters of pregnancy

    j.    Androgen dysregulation:

        (1)    Evaluations to assess androgen levels

    k.    Indications of ulcerative colitis:

        (1)    Evaluation of erythrocyte sedimentation rate;

        (2)    Evaluation of serum C-reactive protein; and/or

        (3)    Colonoscopic evaluation

210.    Using the data collected from comprehensive medical questionnaires completed by the patients, periodic and comprehensive medical examinations, laboratory testing and results, and other specialized evaluations, as alleged herein, qualified licensed medical professionals may predict, detect, and treat these diseases early, thus benefitting the Plaintiff and reducing the likelihood of his premature morbidity, disability, or mortality.

211.    Accordingly, Plaintiff seeks damage from the Defendants, including an order requiring them to fund a medical monitoring program to be created, supervised and implemented by the court in equity.

///

///

## EQUITABLE RELIEF - DISCOVERY TOLLING/STATUTE OF LIMITATIONS

212.    Plaintiff incorporates by reference the factual portion of this Complaint as if fully set forth herein and additionally, or in the alternative, if same be necessary, allege as follows:

213.    Plaintiff plead that the discovery rule should be applied to toll the running of the statute of limitations until Plaintiff knew, or through the exercise of reasonable care and diligence should have known, of facts indicating that the Plaintiff had been injured, the cause of the injury and the tortuous nature of the wrongdoing that caused the injury.

214.    Despite diligent investigation by Plaintiff into the cause of his injuries, including consultations with Plaintiff's medical providers, the nature of Plaintiff's injuries and damages and their relation to PFAS and Defendants' wrongful conduct was not discovered and could not have been discovered, until a date within the applicable statute of limitations for filing each of Plaintiff's claims. Therefore, under appropriate application of the discovery rule, Plaintiff's suit was filed well within the applicable statutory limitations period.

215.    Any applicable statutes of limitations have been tolled by the knowing and active concealment and denial of material facts known by the Defendants when they had a duty to disclose those facts. The Defendants' purposeful and fraudulent acts of concealment have kept Plaintiff ignorant of vital information essential to the pursuit of Plaintiff's claims, without any fault or lack of diligence on Plaintiff's part, for the purpose of obtaining delay on Plaintiff's filing of their causes of action. The Defendants' fraudulent concealment did result in such delay.

///

216.   Defendants are estopped from relying on the statute of limitations defense because Defendants failed to timely disclose, among other things, facts evidencing the defective and unreasonably dangerous nature of their AFFF.

217.   As to all Causes of Action, the nature and breadth of Defendants' deceptive and fraudulent practices are within the complete knowledge of said Defendants such that discovery is required to expose the full and complete extent thereof.

///

*[PRAYER FOR RELIEF FOLLOWS*

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

///

# PRAYER

*WHEREFORE*, Plaintiff herein respectfully prays judgment of this Honorable Court as follows:

1.    For judgment in favor of Plaintiff and against Defendants, jointly and severally; and

2.    For damages and other relief as follows:

## ON THE FIRST CAUSE OF ACTION

### [*Negligence/Gross Negligence*]

Compensation for all damages and injuries sustained by Plaintiff, *i.e.*: under *Cal.Civ.C.*, § 3333 (*inter alia*, actual/special damages, consequential damages, future medical care) and pre-judgment interest on economic damages under *Cal.Civ.C.*, § 3288 - all to be determined at the time of trial.

## ON THE SECOND CAUSE OF ACTION

### [*Strict Liability*]

Compensation for all damages and injuries sustained by Plaintiff, *i.e.*: under *Cal.Civ.C.*, § 3333 (*inter alia*, actual/special damages, consequential damages, future medical care) and pre-judgment interest on economic damages under *Cal.Civ.C.*, § 3288 - all to be determined at the time of trial.

Defendants, under strict liability, knowingly and intentionally violated government safety standards as to the toxic "forever chemicals" (marketing a product which their own tests had shown to be highly dangerous) which was and is conduct evincing callous and conscious disregard of public safety constituting oppression, fraud and/or malice within

the meaning of *Cal.Civ.C.*, § 3294. Plaintiff shall seek and hereby does seek punitive and exemplary damages in an amount to be determined at time of trial.

## ON THE THIRD CAUSE OF ACTION

### [*Defective Product/Design Defect-Consumer Expectations*]

Compensation for all damages and injuries sustained by Plaintiff, *i.e.*: under *Cal.Civ.C.*, § 3333 (*inter alia*, actual/special damages, consequential damages, future medical care) and pre-judgment interest on economic damages under *Cal.Civ.C.*, § 3288 - all to be determined at the time of trial.

Defendants knowingly and intentionally violated government safety standards as to the toxic "forever chemicals" (marketing a product which their own tests had shown to be highly dangerous) which was and is conduct evincing callous and conscious disregard of public safety constituting oppression, fraud and/or malice within the meaning of *Cal.Civ.C.*, § 3294. Plaintiff shall seek and hereby does seek punitive and exemplary damages in an amount to be determined at time of trial.

## ON THE FOURTH CAUSE OF ACTION

### [*Defective Product/Design Defect-Risk/Utility*]

Compensation for all damages and injuries sustained by Plaintiff, *i.e.*: under *Cal.Civ.C.*, § 3333 (*inter alia*, actual/special damages, consequential damages, future medical care) and pre-judgment interest on economic damages under *Cal.Civ.C.*, § 3288 - all to be determined at the time of trial.

Defendants knowingly and intentionally violated government safety standards as to the toxic "forever chemicals" (marketing a product which their own tests had shown to be highly dangerous) which was and is conduct evincing callous and conscious disregard

of public safety constituting oppression, fraud and/or malice within the meaning of *Cal.Civ.C.*, § 3294. Plaintiff shall seek and hereby does seek punitive and exemplary damages in an amount to be determined at time of trial.

## ON THE FIFTH CAUSE OF ACTION

### (*Defective Product-Failure to Warn*)

Compensation for all damages and injuries sustained by Plaintiff, *i.e.*: under *Cal.Civ.C.*, § 3333 (*inter alia*, actual/special damages, consequential damages, future medical care) and pre-judgment interest on economic damages under *Cal.Civ.C.*, § 3288 - all to be determined at the time of trial.

Defendants knowingly and intentionally violated government safety standards as to the toxic "forever chemicals" (marketing a product which their own tests had shown to be highly dangerous) which was and is conduct evincing callous and conscious disregard of public safety constituting oppression, fraud and/or malice within the meaning of *Cal.Civ.C.*, § 3294. Plaintiff shall seek and hereby does seek punitive and exemplary damages in an amount to be determined at time of trial.

## ON THE SIXTH CAUSE OF ACTION

### (*Fraud/Fraudulent Concealment*)

Compensation for all damages and injuries sustained by Plaintiff, *i.e.*: under *Cal.Civ.C.*, § 3333 (*inter alia*, actual/special damages, consequential damages, future medical care) and pre-judgment interest on economic damages under *Cal.Civ.C.*, § 3288 - all to be determined at the time of trial.

Defendants knowingly and intentionally violated government safety standards as to the toxic "forever chemicals" (marketing a product which their own tests had shown to

be highly dangerous) which was and is conduct evincing callous and conscious disregard of public safety constituting oppression, fraud and/or malice within the meaning of *Cal.Civ.C.*, § 3294. Plaintiff shall seek and hereby does seek punitive and exemplary damages in an amount to be determined at time of trial.

## ON THE SEVENTH CAUSE OF ACTION

(*Violation of California Unfair Competition Laws*)

The Court properly issues injunctive relief to prohibit the further sale of the ultra-hazardous PFAS products and to remediate toxic sites in the State of California so as to protect the people of California from further environmental and physical harm.

Plaintiff is entitled to restitution of all pecuniary losses sustained, inclusive of such losses not fully compensated at law.

Defendants knowingly and intentionally violated government safety standards, inclusive of breaching fiduciary duties, as to the toxic "forever chemicals" (marketing a product which their own tests had shown to be highly dangerous) which was and is conduct evincing callous and conscious disregard of public safety constituting oppression, fraud and/or malice within the meaning of *Cal.Civ.C.*, § 3294. Plaintiff shall seek and hereby does seek punitive and exemplary damages in an amount to be determined at time of trial.

///

///

## ON THE EIGHTH CAUSE OF ACTION

(*Violation of Uniform Voidable Transactions Act*)

Defendants, in making the transfers intended to hinder, delay and defraud Plaintiffs, including, but not limited to: the transfers were to insiders, *i.e.*: to corporate entities (some of the co-Defendants) created by some of the Defendants, for the purpose of hindering, delaying and defrauding Plaintiff; the transfers were done at a time when the Defendants had been sued or threatened with suit; and the transfers were made with the transferring debtor knowing that the receiving debtor would incur debts beyond receiving debtor's ability to pay, *e.g.*: Chemours as created by DuPont assumed all DuPont liabilities generally or specifically arising from DuPont's years and years of selling the toxic "forever chemicals", including all liabilities for environmental contamination and harm to human health and safety.

Plaintiff hereby seeks equitable relief under the California Uniform Voidable Transactions Act. Plaintiff respectfully requests that this Honorable Court void all transactions of Defendants in violation of the CUVTA.

## ON THE NINTH CAUSE OF ACTION

[*Medical Monitoring Trust*]

Plaintiff have been exposed to PFOA, PFOS, and potentially other toxic substances at levels greater than normal background levels of PFOS and PFOA, as a direct and proximate result of his use and/or consumption, inhalation or dermal absorption of PFOS and/or PFOA from the Defendants' AFFF products. As such, the Plaintiff is at an increased risk of developing serious adverse health effects that resulted from the use,

storage, and discharge of AFFF. The toxic "forever chemicals" have latency period that can last for many years.

Using the data collected from comprehensive medical questionnaires completed by the patients, periodic and comprehensive medical examinations, laboratory testing and results, and other specialized evaluations, as alleged herein, qualified licensed medical professionals may predict, detect, and treat these diseases early, thus benefitting the Plaintiff and reducing the likelihood of his premature morbidity, disability, or mortality.

Plaintiff seeks relief from the Defendants, including an order requiring them to fund a medical monitoring trust/program to be created, supervised and implemented by the court in equity in a sum to be determined at trial.

<h3 style="text-align:center">EQUITABLE RELIEF</h3>

For Orders of this Honorable Court, both pre-trial and at trial, that Defendants are estopped from relying on the statute of limitations defense as to any claim/cause of action in this Complaint because Defendants failed to timely disclose, and actively concealed, among other things, facts evidencing the defective and unreasonably dangerous nature of their AFFF.

<h3 style="text-align:center">AS TO ALL CAUSES OF ACTION</h3>

1. For judgment on all claims in favor of Plaintiff

2. For costs of suit incurred

3. For attorneys' fees and costs to the fullest extent legally permissible

4. For such other and further relief, legal or equitable, as this Honorable Court may deem just and proper.

///

5.    For such other relief, the assessment of economic and consequential damages, damages for pain and suffering, damages for enjoyment of life, damages provided by statute.

6.    For such other relief as may be requested throughout the Complaint, or as may be provided under any theory of law or fundamental justice, which may be applicable to the facts as they are alleged or as they may be proven at trial (whether designated to a particular Count or not), including all other relief as may be just and proper.

## JURY DEMAND

Plaintiff respectfully demands jury trial on all causes of action appropriate.

DATED:   October 13, 2022          */s/ Jeremy C. Shafer*

*By*:    _____

Jeremy C. Shafer (*jshafer@bannerlegal.com*)
VETERAN LEGAL GROUP
700 12th Street N.W., Suite 700
Washington, D.C.          20005
Tel: (888) 215-7834

S. James Boumil (*sjboumil@boumil-law.com*)
BOUMIL LAW OFFICES
120 Fairmount Street
Lowell, MA, 01852
Tel: (978) 458-0507

Konstantine Kyros (*kon@kyroslaw.com*)
KYROS LAW
17 Miles Rd.
Hingham, MA 02043
Tel:  (800) 934-2921

Attorneys for Plaintiff,
DAVID MARTIN

///